## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

*In re* Petition of

Agency for Policy Coordination on State
Property; Erdenet Mining Corporation; Erdenes
Oyu Tolgoi LLC


For an Order to Take Discovery from JPMorgan
Chase Bank, N.A.


Pursuant to 28 U.S.C. § 1782 in Aid of a
Foreign Proceeding

Civil Action No. _____

---

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' *EX PARTE* PETITION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

James E. Berger
Charlene C. Sun
Joshua S. Wan
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Tel: (212) 556-2202
Fax: (212) 556-2222
*jberger@kslaw.com*
*csun@kslaw.com*
*jwan@kslaw.com*

*Attorneys for Petitioners Agency for Policy
Coordination on State Property, Erdenet
Mining Corporation, Erdenes Oyu Tolgoi
LLC*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

I.   FACTUAL BACKGROUND ................................................................................... 4

    A.   THE PETITIONERS ................................................................................... 4

    B.   THE MONGOLIAN PROCEEDINGS ........................................................... 4

        1.   The Defendants in the Mongolian Proceedings ......................... 5

        2.   Erdenet Mine Scheme:  Defendants' Corrupt and Illegal Transactions Relating to the Erdenet Mine ..................................................... 6

        3.   Oyu Tolgoi Mine Scheme:  Defendants Received Undisclosed Illegal Kickbacks in Exchange for Favors from the Government Relating to the Oyu Tolgoi Mine ................................................................. 10

    C.   THE EVIDENCE LINKING BATBOLD TO THE PROXIES INVOLVED IN THE ERDENET AND OYU TOLGOI SCHEMES ...................................................... 11

    D.   OTHER RELATED PROCEEDINGS ........................................................... 12

    E.   RELATIONSHIP BETWEEN JPMORGAN AND THE ALLEGATIONS AGAINST DEFENDANTS ...................................................................................... 12

II.   ARGUMENT ....................................................................................................... 13

    A.   THIS PETITION SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782 . 13

        1.   JPMorgan Is Found In This District ........................................ 14

        2.   Discovery Sought is "For Use" Before a "Foreign Tribunal" ................ 15

        3.   Petitioners are Interested Persons ............................................ 16

    B.   THIS COURT SHOULD EXERCISE ITS DISCRETION IN FAVOR OF GRANTING THE PETITION ................................................................................................. 17

        1.   The First *Intel* Factor Favors Granting Discovery ................... 18

        2.   The Second *Intel* Factor Favors Granting Discovery .............. 18

        3.   The Third *Intel* Factor Favors Granting Discovery ................. 19

        4.   The Fourth *Intel* Factor Favors Granting Discovery ............... 20

III.   CONCLUSION ................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Accent Delight Int'l Ltd.*,
     791 F. App'x 247 (2d Cir. 2019) .........................................................................21

*In re Accent Delight Int'l Ltd.*,
     869 F.3d 121 (2d Cir. 2017).................................................................................16

*In re Ex Parte Application of Kleimar N.V.*,
     220 F. Supp. 3d 517 (S.D.N.Y. 2016)..................................................................21

*In re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting
     Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries &
     other non-participants for use in Actions Pending in the Norway*, 249 F.R.D.
     96 (S.D.N.Y. 2008) .......................................................................................20, 21

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
     673 F.3d 76 (2d Cir. 2012).............................................................14, 15, 17, 20

*In re Catalyst Managerial Servs., DMCC*,
     680 F. App'x 37 (2d Cir. 2017) ...........................................................................21

*In re del Valle Ruiz*,
     939 F.3d 520 (2d Cir. 2019).................................................................................15

*In re Euromepa*,
     51 F.3d 1095 (2d Cir. 1995).........................................................................18, 21

*In re Gorsoan Ltd.*,
     652 F. App'x 7 (2d Cir. 2016) .......................................................................17, 19

*Gushlak v. Gushlak*,
     486 F. App'x 215 (2d Cir. 2012) ...........................................................................1

*In re Hansainvest Hanseatische Inv.-GmbH*,
     364 F. Supp. 3d 243 (S.D.N.Y. 2018)............................................................18, 20

*In re Hornbeam Corp.*,
     722 F. App'x 7 (2d Cir. 2018) ...............................................................................1

*Intel Corp. v. Advanced Micro Devices, Inc.*,
     542 U.S. 241 (2004)................................................................................... *passim*

*In re Iraq Telecom Ltd.*,
   No. 18MC458LGSOTW, 2019 WL 3798059 (S.D.N.Y. Aug. 13, 2019),
   *reconsideration denied*, No. 18MC458LGSOTW, 2019 WL 5080007
   (S.D.N.Y. Oct. 10, 2019) .............................................................................................18

*Lancaster Factoring Co. Ltd. v. Mangone*,
   90 F.3d 38 (2d Cir. 1996).........................................................................................16

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015)............................................................................. *passim*

*In re O'Keeffe*,
   650 F. App'x 83 (2d Cir. 2016) .............................................................................1, 18

*In re Order Permitting Metallgesellschaft AG to Take Discovery*,
   121 F.3d 77 (2d Cir. 1997).................................................................................17, 19

*In re Piraeus Bank*,
   No. 20-mc-210 (RA), 2020 WL 2521322 (S.D.N.Y. May 18, 2020)......................15

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,
   376 F.3d 79 (2d Cir. 2004).......................................................................................14

*In re Top Matrix Holdings Ltd.*,
   No. 18 MISC. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ...................20

**Statutes**

28 U.S.C. § 1782.................................................................................................. *passim*

**Rule**

Fed. R. Civ. P. 26.......................................................................................................21

The Agency for Policy Coordination on State Property (the "Agency"), Erdenet Mining Corporation ("Erdenet"), and Erdenes Oyu Tolgoi LLC ("EOT") (collectively, the "Petitioners"), by their undersigned counsel, respectfully submit this memorandum of law in support of their *ex parte* Petition (the "Petition") for an order pursuant to 28 U.S.C. § 1782 ("Section 1782") authorizing Petitioners to seek discovery from JPMorgan Chase Bank, N.A.("JPMorgan" or "Respondent") in the form of the attached subpoenas *duces tecum* (the "Subpoena").[1]

## PRELIMINARY STATEMENT

This Petition arises out of court proceedings in the Civil Court of First Instance in Bayanzurkh District, Ulaanbaatar City, Mongolia (the "Mongolian Court") commenced by Petitioners, who are represented by the Metropolitan Prosecutor's Office, against Batbold Sukhbaatar ("Batbold") and a number of individuals and entities whom Petitioners allege act as proxies to Batbold, namely, Ganzorig Chimiddorj, Tuul Ulambayar, Nyamdalai Ochirbat, Cheong Choo Young ("Cheong"), Kim Hak Seon ("Kim"), Kim Yoonjung, Lee Yu Jeong, Rhee Byung Wook, Kang Eun Joo, Battushig Batbold (Batbold's son), Catrison Limited, Cliveden Trading AG, and Genetrade Limited (collectively, the "Defendants") (the "Mongolian Proceedings").  *See* Declaration of Sarah Y. Walker, dated February 11, 2021 ("Walker Decl."), ¶ 2.

In the Mongolian Proceedings, Petitioners allege that Batbold, acting in concert with other Defendants, engaged in a series of illegal and fraudulent transactions related to two of the most valuable and prized natural resources in Mongolia, the Erdenet and Oyu Tolgoi mines.  These

---

[1] Petitioners seek discovery on an *ex parte* basis in accordance with the accepted practice in this Court and in many other courts to seek relief pursuant to 28 U.S.C. § 1782 on an *ex parte* basis.  *See e.g., In re Hornbeam Corp.*, 722 F. App'x 7, 10 (2d Cir. 2018) (noting that there is no impropriety in bringing Section 1782 applications *ex parte* since respondents may move to quash); *In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2016) (rejecting the suggestion that bringing a Section 1782 application *ex parte* is "impermissible or improper"); *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.") (collecting cases).

transactions were made and facilitated by, and went undetected for years as a result of, Batbold's use of various individual and corporate proxies transacting business on his behalf.  After executing these transactions and diverting assets belonging to Petitioners to accounts within their own control, Petitioners allege that Defendants further transferred, disguised, and concealed the ownership of their ill-gotten gains, including through the use of a complex network of offshore and onshore corporate structures and proxies across numerous jurisdictions.  In fact, Defendants' extraordinary efforts to conceal their misconduct prevented Petitioners from discovering Defendants' conduct for many years, and Petitioners were only able to begin to uncover Defendants' schemes after a year-long investigation.  Petitioners commenced the Mongolian Proceedings to recover compensatory damages from Defendants, as well as to disgorge any gains, revenues, and profits Defendants accrued through their wrongdoing, presently in the amount of MNT 713,575,000,000 (approximately $250 million).  Documents and information generated from the instant Petition will support the allegations of fraud and breaches of fiduciary duty leveled against Defendants in the Mongolian Proceedings and elsewhere.  Walker Decl., ¶ 60.

JPMorgan is not a participant in the Mongolian Proceedings and is not alleged to have engaged in any wrongdoing in connection with either matter.  Petitioners, however, believe that JPMorgan — which was contractually designated as a correspondent bank for payments arising from one of the contracts resulting from Defendants' alleged schemes — is likely to have evidence (*i.e.*, in the form of international wire transfer documentation) of payments made in connection with the myriad of transactions made by Defendants in the course of their scheme and attempt to conceal their assets.  As a result, Petitioners seek wire transfer information from JPMorgan evidencing payments involving Defendants and other relevant individuals/entities.

As discussed below, this Petition meets all of the statutory requirements of Section 1782. Respondent is "found" in this District because it (i) maintains its headquarters and/or principal place of business here, and (ii) would be in possession of the evidence sought as a direct result of their role serving as a correspondent bank in this District. The discovery sought is highly material and relevant to the issues at stake in the ongoing Mongolian Proceedings and is "for use" in those proceedings. Specifically, the documents and information requested will help Petitioners corroborate and establish the claims of fraud and breach of fiduciary duty on the part of Defendants.

Moreover, all of the *Intel* discretionary factors are met. Respondent is not a participant in the Mongolian Proceedings, and lies beyond the jurisdiction of the Mongolian Court. There is nothing to indicate that the Mongolian Court will decline U.S. judicial assistance, nor is this discovery request an attempt to circumvent any proof-gathering restrictions therein. Finally, Petitioners' discovery request should not impose undue burden, as it is narrowly tailored to seek only readily-accessible electronic wire transfer data relating to transfers involving a discrete number of individuals/entities.

Accordingly, Petitioners respectfully request that this Court grant the Petition and permit Petitioners to serve the Subpoena on the Respondent.

I.    **FACTUAL BACKGROUND**

A.    **THE PETITIONERS**

The Agency is the Mongolian government agency that owns and manages state-owned enterprises in various industry sectors, including energy production, mining, and transport.  Walker Decl., ¶ 6.  The Agency is the 100-percent shareholder of Erdenet.[2]

Erdenet is a state-owned mining company that owns Mongolia's mining interests in the Erdenet mine, one of the largest copper and molybdenum mines in the world.  *Id*. ¶ 7.

EOT is a 34-percent shareholder of Oyu Tolgoi LLC, the project company that controls the operation of the Oyu Tolgoi mine, a copper-gold project in Mongolia's Ömnögovi Province in the South Gobi Desert, and one of the world's largest new copper-gold mines.  *Id*. ¶ 8.  In December 2011, during his tenure as Prime Minister, Defendant Batbold established EOT to hold Mongolia's share in the Oyu Tolgoi project.

In this proceeding and in the Mongolian Proceedings, Petitioners are represented by the Metropolitan Prosecutor's Office, which is a subdivision of the office of the Prosecutor General of Mongolia.  *Id*. ¶ 9.

B.    **THE MONGOLIAN PROCEEDINGS**

On October 14, 2020, Petitioners, represented by the Metropolitan Prosecutor's Office, filed a claim before the Mongolian Court against Defendants to recover assets illegally diverted by Defendants.  *Id*. ¶ 10.  On October 28, 2020, the Mongolian Court issued a judicial decree initiating a civil case based on the Mongolian Complaint.  *Id*.  Batbold was served with the

---

[2] At the time of the events described below, Erdenet was co-owned by the State Property Committee of the Mongolian government (51%) and Russian state-owned entity the State Corporation for Assistance to Development, Production and Export of Advanced Technology Industrial Product ("Rostec").  On January 15, 2018, Erdenet became 100% owned by the Agency.

Mongolian Complaint and supporting papers on November 3, 2020. A description of the Defendants and overview of Petitioners' claims in the Mongolian Proceedings is provided below.

### 1. The Defendants in the Mongolian Proceedings

#### a. Batbold Sukhbaatar

Batbold is the former Prime Minister of Mongolia, a sitting member of the Mongolian parliament, and a businessman. Walker Decl., ¶ 11. Batbold has held several powerful political positions in Mongolia and in the Mongolian People's Party, including Minister of Foreign Affairs (2008-2009), Minister of Industry and Trade (2004-2006), and Member of the Leadership Council of the Mongolian People's Revolutionary Party (the former name of the Mongolian People's Party) (2001-2005). *Id.* During Batbold's tenure as Prime Minister from 2009 to 2012, he had effective control of the country's natural resources, and through his own wrongful actions, as well as through actions of others acting in concert with him or taken on his behalf, Petitioners allege that Batbold abused his power and wrongfully diverted very significant assets owned by the Petitioners to accounts held by others on his behalf or under his direction, but ultimately for his own personal enrichment. *Id.*

#### b. Batbold's Proxies

The remaining Defendants in the Mongolian Proceedings are individuals and entities who Petitioners allege assisted or acted for the benefit of Batbold, including by (i) facilitating the diversion of the Petitioners' assets; and (ii) holding funds or assets for the ultimate beneficial ownership of Batbold, including funds derived from the sale of the Petitioners' valuable natural resources and from illegal kickbacks that Batbold received ("Batbold Proxies"). *Id.* ¶ 12.

Two key Batbold Proxies are Defendants Cheong and Kim, a husband-and-wife duo of South Korean nationality who reside in Hong Kong. From 1987 to 2007, Cheong worked for Samsung Construction & Trading Corporation C&T ("Samsung"). *Id.* ¶ 13. For five years during

that period, Cheong worked in Mongolia at "ERDSAM," a copper joint venture between Erdenet and Samsung. *Id.* Cheong's wife, Kim, is a linguistics academic who moved to Mongolia to join her husband, Cheong. Kim has no apparent prior experience or specialist knowledge about the mining industry. *Id.*

Petitioners believe that Cheong left Samsung on February 1, 2007, returned to Mongolia from Korea, and began working as a proxy for Batbold. *Id.* ¶ 14. Petitioners allege that, since then, Cheong and Kim have been connected to countless offshore and onshore companies incorporated in several jurisdictions around the world that are related to Batbold. They also control and/or exercise material influence over (whether now or at one point) real estate used by the Batbold family worth in excess of $55 million in, among other places, New York, Hong Kong, London and Thailand. *Id.*

The connections between Cheong and Kim and Batbold and his family are discussed in greater detail in Section I.C.

> **2.  Erdenet Mine Scheme:  Defendants' Corrupt and Illegal Transactions Relating to the Erdenet Mine**

Petitioners allege that beginning in October 2009, Batbold, as Prime Minister, oversaw the State Property Committee, which at the time was the majority owner of Erdenet. *Id.* ¶¶ 11, 15. In or around 2019, Petitioners discovered that the Defendants had concluded illegal transactions with several foreign legal entities to unlawfully enrich Batbold. *Id.* ¶ 15. Specifically, at the time Batbold was overseeing the State Property Committee, Erdenet entered into valuable contracts for the trade of copper and molybdenum concentrate with at least three newly-formed companies: Catrison Limited ("Catrison"), Cliveden Trading AG ("Cliveden"), Genetrade Limited ("Genetrade"). Evidence obtained by Petitioners strongly suggest that these companies were controlled on behalf of Batbold by Cheong and Kim. *Id.* Petitioners allege that these "insider"

transactions allowed Batbold and his proxies to profit directly from these contracts. At no point did Batbold disclose his involvement with, or links to, these companies, in violation of Mongolian law.

### a.    Erdenet's Contracts with Catrison

Catrison is an active Hong Kong company established by Batbold Proxies. *Id*. ¶ 20. Specifically, Catrison was established on February 8, 2011, and is and has been controlled from time to time by Kim, among others. *Id*.

On February 14, 2011, Catrison secured a contract with Erdenet to purchase 150,000 WMT of copper concentrates from Erdenet over a period of three years (the "First Catrison Contract"). *Id*. ¶ 21. At the time the First Catrison Contract was executed, Catrison had existed for less than a week and did not have any history of trading in copper concentrates. Neither Catrison's sole shareholder, Kim, nor its then sole director, another Batbold Proxy, Kim Yoonjung ("Yoonjung"), at the time had any prior experience or technical expertise in copper concentrates. Petitioners are unable to ascertain how Kim, Yoonjung, or Catrison (a brand-new company at the time) obtained financing to purchase copper concentrates from Erdenet, as there is no indication that either individual then possessed the personal funds or the creditworthiness to secure such financing. *Id*. The same parties subsequently executed a second contract on December 14, 2011 (the "Second Catrison Contract"), under which Catrison agreed to purchase 240,000 WMT over three years. *Id*.

In 2011, Erdenet sold 45,027.25 WMT of copper concentrates to Catrison at a total cost of $68,974,595.58. *Id*. ¶ 22. In 2012, Erdenet sold an additional 63,831.91 WMT of copper concentrates at a total cost of $92,935,795.53. *Id*. Almost immediately after entering into each of these sales contracts, Catrison re-sold some or all of the copper concentrates that it purchased from Erdenet to Ocean Partners UK Limited ("OPUK"), a U.K.-based commodities trading company. Prior to 2011, Erdenet sold copper concentrates directly to OPUK, one of Erdenet's largest

customers.  It was therefore highly unusual when Erdenet suddenly began awarding contracts to

Catrison — a new entity controlled by individuals with no apparent experience in the industry —

instead of continuing to sell directly to OPUK, as it had done previously.  Individuals from

OPUK's affiliate in the United States, Ocean Partners USA, were in direct contact with Catrison

and, at times, even handled shipments and communications with Erdenet on behalf of Catrison.

*Id*.  In a cryptic email to Erdenet, one individual from Ocean Partners USA (the U.S. affiliate of

OPUK) stated that the Catrison shipments were "not well discussed," and ended her email with

the words "I don't wish to cause any problems discussing the "c" shipments."  *Id*.

Each of the Catrison contracts was denominated in U.S. Dollars, and Petitioners are aware

that the Defendants executed numerous transactions in U.S. Dollars pursuant to these contracts.

*Id*. ¶ 23.  These large transactions, which involved purchases of copper concentrates valued in the

hundreds of millions of dollars, involved several steps, including obtaining financing, purchasing

copper concentrates from Erdenet, and reselling to other entities.  *Id*.  While Petitioners do not

have currently have comprehensive evidence about Catrison's financing arrangements, they are

aware that at least some of these transactions were facilitated in some respect by banks in New

York.  In particular, according to the Second Amendment to the Second Catrison Contract,

JPMorgan, with an address at 1 Chase Manhattan Plaza, New York, NY 10081, was used as an

intermediary bank for payments made by Erdenet to Catrison.  *Id*.  As a result, Petitioners believe

that JPMorgan serviced transactions related to the Catrison contracts.

**b.**     **Erdenet's Contracts with Genetrade**

In November 2010, Cheong set up a BVI entity called Genetrade Limited in consultation

with, and with the approval of, Batbold's then personal banker, Yuan Wang ("Wang").  *Id*. ¶ 16.

According to correspondence between Cheong, Wang, and a BVI corporate service provider

representative, Cheong and Wang decided that Genetrade should be held in the name of Kang Eun

Joo ("Kang") who, like Cheong, is a South Korean citizen, a former employee of Samsung, and a suspected proxy of Batbold.  *Id.* ¶ 17.  They also decided that Genetrade should be owned by Grandcastle Assets Inc. ("Grandcastle"), a company in which Batbold and his eldest son, Battushig, maintained beneficial ownership interests.  *Id.*

Shortly after it was incorporated, Genetrade was awarded its first sales contract by Erdenet, on December 24, 2010, for the purchase of 3,300 wet metric tons ("WMT") of molybdenum flotation concentrates.  *Id.* ¶ 18.  On December 6, 2011, Genetrade obtained a second contract with Erdenet, again signed by Ganzorig and Kang, for the purchase of 3,800 WMT of molybdenum flotation concentrates (collectively, the Genetrade Contracts).  *Id.*  Documents indicate that Batbold and Battushig were ultimate beneficial owners of Genetrade throughout this period.  *Id.*

Pursuant to the Genetrade Contracts, Erdenet sold 6,967.258 WMT of molybdenum flotation concentrates to Genetrade at a total cost of $68,428,437.56 million.  *Id.* ¶ 19.  Each of the Genetrade contracts is denominated in U.S. Dollars.  *Id.*  Petitioners believe that Genetrade ultimately re-sold molybdenum concentrate to foreign buyers.  *Id.*

### c.    Erdenet's Contracts with Cliveden

Cliveden is a Swiss company that was established on December 9, 2011.  On January 26, 2012, Kim was appointed as director of Cliveden.  *Id.* ¶ 24.  Petitioners allege that, from January 2012 until at least September 2016, Cliveden was controlled by Batbold Proxies Kim and/or Eoin Barry Saadien, whether through their executive position in Cliveden itself or through Kim's ownership of a Hong Kong company (Ever Global Trading Limited), which held a substantial shareholding in Cliveden (between January 26, 2012 and September 22, 2016).  *Id.* ¶ 24.  During

that time, Cliveden concluded two contracts with Erdenet for the purchase of copper concentrates. Each of the Cliveden contracts was denominated in U.S. Dollars.  *Id*.

> **3.      Oyu Tolgoi Mine Scheme:  Defendants Received Undisclosed Illegal Kickbacks in Exchange for Favors from the Government Relating to the Oyu Tolgoi Mine**

Petitioners further allege that, at key points during the commercial life of the Oyu Tolgoi mine, the Defendants (on behalf of Batbold), including Cheong in particular, illegally received assets from offshore and onshore companies in return for favors granted to, among others, the private shareholder and operator of the Oyu Tolgoi mine, Canadian mining company Ivanhoe Mines Limited ("Ivanhoe") (the "Oyu Tolgoi Mine Scheme").  *Id*. ¶ 25.  Petitioners' principal allegations with respect to the Oyu Tolgoi Mine Scheme are as follows:

First, in the summer and fall of 2010, when the board of the project company, Oyu Tolgoi LLC, was selected, and Batbold made an important and highly publicized site visit to the Oyu Tolgoi mine, individuals linked to Ivanhoe registered a series of offshore corporate entities that they would later use to transfer assets or make payments to Batbold proxies.  *Id*. ¶ 26.

Second, around December 2010, when the Mongolian government was negotiating with Ivanhoe and Rio Tinto about the ownership and management of the mine — Ivanhoe-linked individuals and entities transferred assets to Batbold proxies.  *Id*. ¶ 27.  Petitioners are aware that many of the payments and asset transfers to Batbold's proxies were made in U.S. Dollars, and many of these benefits, whether direct cash payments, appointments to corporate directorships, or interests in business ventures, were accepted by Cheong on behalf of Batbold.  *Id*.

Third, around June 2011, when further negotiations over the financing and management of the mine took place, Ivanhoe-linked individuals made several transfers of assets and cash to entities believed to be controlled by Batbold and his proxies.  *Id*. ¶ 28.

### C.   THE EVIDENCE LINKING BATBOLD TO THE PROXIES INVOLVED IN THE ERDENET AND OYU TOLGOI SCHEMES

As discussed in Section I.A. above, Cheong and Kim were the individuals primarily involved in the formation of Catrison, Cliveden, and Genetrade, and in the execution and performance of the contracts between Erdenet and those entities.  In the case of the Genetrade Contracts, Batbold and his family members had direct ties to Genetrade and affiliated entities.  With respect to Catrison and Cliveden, although Batbold did not appear on documents directly related to these entities, there is substantial evidence linking Cheong and Kim to Batbold, further substantiating Petitioners' allegations in the Mongolian Proceedings that Cheong and Kim act as Batbold proxies.  As discussed in further detail in the Walker Declaration, Cheong and Kim are directly connected to Batbold and his family in the following ways.

First, as set forth at Paragraph 30 of the Walker Declaration, Cheong and Kim control or controlled valuable real estate that they themselves do not appear to visit but that Batbold and his family do appear to visit or live in.  *Id*. ¶ 30.  This real estate is located in, among other places, London, New York, and Thailand.  Cheong and Kim, or other Batbold Proxies, control further real estate in Hong Kong, among other places.  *Id*.  In total, Petitioners believe that Cheong and Kim own or control real estate worth at least $55 million on behalf of Batbold and his family.  *Id*. ¶ 52.

Second, as set forth in greater detail in Paragraphs 31 to 51 of the Walker Declaration, Cheong and Kim also have a wide array of corporate connections with Batbold and his family.  Corporate documents reflect that Cheong legally owns and/or controls several companies (*i.e.*, Premier Edge Limited, Winrock Invest Limited, Genetrade Limited, Grandcastle Assets Inc., and Elmbridge Assets Limited) of which Batbold is documented as the beneficial owner.  *Id*. ¶ 31.  Documents further show that Batbold incorporated several offshore companies in the BVI while he was Minister of Trade and Foreign Minister, and he subsequently passed legal ownership and/or

control of those companies to his proxies (primarily Cheong) in an apparent effort to, among other things, avoid the disclosure obligations in Mongolia's Anti-Corruption Law of 2006.  *Id.* ¶¶ 33, 39, 41.  Batbold, however, continued to beneficially own those companies — and the expensive real estate and other assets that they ultimately held — while he was Prime Minister and, in some cases, Petitioners believe he continues to covertly hold those interests to this day.  *Id.*

### D.    OTHER RELATED PROCEEDINGS

Petitioners also sought and obtained freezing injunctions valued at approximately $70 million against Batbold and others in England, Hong Kong, Jersey, and Singapore, and obtained a court order for disclosure in the BVI from offshore corporate service providers used by Batbold. *Id.* ¶ 52.

On November 23, 2020, Petitioners commenced an action in the Supreme Court of the State of New York, New York County (Index No. 656507/2020) seeking an attachment of certain property located in New York believed to be beneficially owned by Batbold.  Pursuant to an agreement by the defendants in that action to provide reasonable notice to Petitioners of any planned disposition of those properties, the New York action was voluntarily withdrawn without prejudice on January 19, 2021.  *Id.*

### E.    RELATIONSHIP BETWEEN JPMORGAN AND THE ALLEGATIONS AGAINST DEFENDANTS

Petitioners seek discovery from JPMorgan to obtain wire transfer information that can be used to trace the flow of funds that Petitioners allege were illegally diverted by Defendants and hidden from the Mongolian government through the use of a complex network of individuals and corporate proxies.   Petitioners believe such wire transfer information is likely to provide documentary evidence to assist Petitioners in (i) further demonstrating the strong links between Batbold and the Batbold Proxies, (ii) establishing how Batbold and the other Defendants profited

from the self-dealing and fraudulent conduct alleged by Petitioners, and (iii) understanding and calculating the quantum of such profit.

Petitioners understand that foreign originating banks generally use U.S. correspondent banks when making international U.S. dollar-denominated wire transfers.  *Id.* ¶ 60.  As discussed above, JPMorgan was identified as the designated correspondent bank for transactions under the Catrison contracts.  Moreover, each of the undisclosed and illegal contracts between Erdenet, on one hand, and Catrison, Cliveden, and Genetrade, on the other hand, required payments in U.S. Dollars.  *Id.*  Given that many of the same players were involved in Erdenet's contracts with Genetrade and Cliveden, Petitioners believe it is likely that JPMorgan may have also served as a correspondent bank for payments arising from those contracts as well, and is likely to possess information about Defendants' U.S. dollar-denominated transactions during the relevant time period.  *Id.*  Accordingly, Petitioners seek from JPMorgan wire transfer information pertaining to payments involving any of the Defendants and other key individuals or entities allegedly involved in the Erdenet and Oyu Tolgoi schemes during the period from January 1, 2011 (*i.e.*, a date shortly before the incorporation of Catrison, on February 8, 2011) through the present.

## II.   ARGUMENT

### A.   THIS PETITION SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  Section 1782 is "provided for assistance in obtaining documentary and other tangible evidence as well as testimony."  *Id.* at 248.  The statute reads, in pertinent part:

> *The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal*

> . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal *or upon the application of any interested person* and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court . . .

28 U.S.C. § 1782 (emphasis added).

Section 1782's statutory factors permit a district court to grant an application where Petitioners can establish:  "(1) that the person from whom discovery is sought reside[s] (or [is] found) in the district of the district court to which the application is made, (2) that the discovery [is] for use in a proceeding before a foreign tribunal, and (3) that the application [is] made by a foreign or international tribunal or 'any interested person.'"  *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004) (quoting *In re Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996) (*per curiam*)); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (citing statutory factors); *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) (citing same).

Petitioners satisfy each of the three statutory requirements set forth in Section 1782.  First, JPMorgan, the party from whom discovery is sought, is found within this District.  Second, the documents requested by Petitioners are "for use" in "foreign proceedings" in Mongolia.  Third, as Petitioners in the Mongolian Proceedings, Petitioners qualify as an "interested person" under Section 1782.

### 1.     JPMorgan Is Found In This District

The first statutory requirement for jurisdiction is that the "person from whom discovery is sought reside[s] (or [is] found) in the district of the district court to which the application is made." *Schmitz*, 376 F.3d at 83; *see In re Piraeus Bank*, No. 20-mc-210 (RA), 2020 WL 2521322, at *2 (S.D.N.Y. May 18, 2020) (granting section 1782 discovery from, *inter alia*, Citibank, HSBC, Bank of New York Mellon, and JPMorgan Chase Bank).  The Court of Appeals for this Circuit had held

that the "resides or is found" language in Section 1782 extends to the limits of personal jurisdiction consistent with due process.  *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019).

This Court has specific jurisdiction over JPMorgan because JPMorgan has purposefully availed itself of this forum such that, *but-for* its forum contacts (*i.e.*, the transaction of significant business in this District by serving as a correspondent bank for the purpose of processing U.S. dollar transfers for foreign banks), the evidence sought would not be available at all.  *See In re del Valle Ruiz*, 939 F.3d at 530 ("[W]here the discovery material sought proximately resulted from the respondent's forum contacts, that would be sufficient to establish specific jurisdiction for ordering discover.").  Specifically, the wire transfer information sought by Petitioners only exists and is in JPMorgan's possession as a consequence of its service as a correspondent bank for foreign U.S. dollar transactions through its New York branch in this District (as shown by JPMorgan's New York address listed in the Catrison contract).  Thus, the Petition satisfies the first requirement under Section 1782.

### 2.     Discovery Sought is "For Use" Before a "Foreign Tribunal"

The information sought in the Subpoena is for use in an ongoing foreign litigation proceeding pending before the courts of Mongolia.  It is indisputable that civil litigation proceedings conducted before foreign courts satisfy Section 1782's "for use" requirement.  *See, e.g., Brandi-Dohrn*, 673 F.3d at 82 (considering German judicial proceedings to satisfy the definition of "foreign tribunal" under Section 1782).  Whether discovery is "'for use in a [foreign] proceeding'" is analyzed "according to the particular facts of each case."  *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 129, 131 (2d Cir. 2017).  For instance, this requirement is met if the requested discovery will provide "some advantage or serve some use in the proceeding."  *Mees*, 793 F.3d at 298 (adopting a plain meaning of the phrase "for use in a proceeding").  This includes

instances when an applicant exhibits the "practical ability to inject the requested information into [the] foreign proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d at 132.

Here, Petitioners satisfy the "for use" requirement.  As stated above, the evidence sought will help Petitioners support their allegations of fraud and breach of fiduciary duties against Defendants, specifically by (i) further demonstrating the strong links between Batbold and the Batbold Proxies, (ii) establishing how Batbold and the other Defendants profited from the self-dealing and fraudulent conduct alleged by Petitioners and (iii) proving the quantum of such profit. Evidence obtained through this Petition may be proffered as evidence in the Mongolian Proceedings, which are adjudicative in nature, and will assist the Mongolian Court in determining the merits of Petitioners' claims.  Janchivdorj Decl., dated February 10, 2021, ¶ 6.  Petitioners will have the ability to inject evidence gathered from the instant Petition into the pending Mongolian Proceedings.  *Id.* ¶ 7.  As a result, the Petition satisfies the second requirement under Section 1782.

### 3.     Petitioners are Interested Persons

Petitioners are clearly "interested person[s]" within the meaning of Section 1782.  The Supreme Court has explicitly stated that an "interested person" is a "complainant [who] 'possess[es] a reasonable interest in obtaining [judicial] assistance.'"  *Intel*, 542 U.S. at 256.  A litigant in a foreign proceeding plainly falls within the definition of "interested person."  *See Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) ("The legislative history to § 1782 makes plain that 'interested person' includes 'a party to the foreign . . . litigation.'").

Here, Petitioners are the plaintiffs in the Mongolian Proceedings and have standing and the ability to introduce any evidence they obtain through this proceeding in the Mongolian Proceedings.  Accordingly, the Petition meets the third statutory factor.

**B.  THIS COURT SHOULD EXERCISE ITS DISCRETION IN FAVOR OF GRANTING THE PETITION**

Where, as here, all of the mandatory elements of Section 1782 are met, a district court may grant discovery in its discretion.  *See In re Application Gorsoan Ltd*, 652 F. App'x 7, 8 (2d Cir. 2016) (explaining that courts should examine the discretionary *Intel* Factors after determining that Section 1782's three statutory requirements have been met).  This discretion is exercised "in light of the twin aims of the statute:  providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."  *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) (citing *In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)).  In pursuit of these twin goals, the statute has, over the years, been given "increasingly broad applicability."  *Brandi-Dohrn*, 673 F.3d at 80 (citing *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir.), *cert. denied*, 510 U.S. 965, 114 S. Ct. 443 (1993)).

To aid the exercise of such discretion, the *Intel* Court established the following four factors for consideration:  (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," because the "need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is otherwise "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 264–65; *Mees*, 793 F.3d at 298 (reciting same factors).  Each of these discretionary factors weighs in favor of granting the requested relief here.

### 1.      The First *Intel* Factor Favors Granting Discovery

The first *Intel* factor instructs district courts to consider whether the requested discovery is within the foreign tribunal's jurisdictional reach and thus accessible without Section 1782 aid. *Intel*, 542 U.S. at 264–65.  Thus, courts routinely grant discovery where, as here, the respondent is not a party to the foreign proceeding.  *In re O'Keeffe*, 650 F. App'x at 85 (granting discovery against nonparty); *In re Iraq Telecom Ltd.*, No. 18-MC-458 (LGS)(OTW), 2019 WL 3798059, at *4 (S.D.N.Y. Aug. 13, 2019), *reconsideration denied*, No. 18-MC-458 (LGS)(OTW), 2019 WL 5080007 (S.D.N.Y. Oct. 10, 2019) (granting discovery against nonparty banks because they held quality records of accounts); *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 250 (S.D.N.Y. 2018) (granting discovery against third party).

Here, JPMorgan is not a party to the Mongolian Proceedings and the Mongolian Court does not have jurisdiction to order it to produce the requested evidence.  Janchivdorj Decl., ¶¶ 4-5.  The first *Intel* factor thus weighs in favor of discovery.

### 2.      The Second *Intel* Factor Favors Granting Discovery

 Likewise, the second *Intel* factor concerning the receptivity of discovery by the foreign tribunal also weighs in favor of Petitioners.  Courts have held that this factor weighs in favor of granting discovery unless there is "authoritative proof" that a foreign tribunal would reject evidence obtained with the aid of Section 1782.  *In re O'Keeffe*, 650 F. App'x at 85 (2d Cir. 2016) (noting the absence of evidence that the foreign court would be unreceptive to U.S. judicial assistance); *In re Euromepa*, 51 F.3d 1095, 1100 (2d Cir. 1995); *In re Iraq Telecom Ltd.*, 2019 WL 3798059, at *4, *reconsideration denied*, (requiring authoritative proof that a foreign tribunal would "reject" discovery).

In the present case, Petitioners have no reason to believe that the Mongolian Court will reject evidence obtained through this Petition.  Janchivdorj Decl., ¶ 7.  Moreover, Petitioners have

the ability to supplement the evidentiary record in the Mongolian Proceedings at any time before trial.  Further, any evidence obtained through this Application may be introduced at trial in the Mongolian Proceedings.  *Id*.  Thus, the second *Intel* factor also weighs in favor of discovery.

### 3.    The Third *Intel* Factor Favors Granting Discovery

The third *Intel* factor requires this Court to consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  This is not, however, tantamount to requiring the petition to prove that the evidence sought is discoverable in the foreign jurisdiction; to the contrary, courts have held repeatedly that there is no "requirement that evidence sought in the United States pursuant to § 1782(a) be discoverable under the laws of the foreign country that is the locus of the underlying proceeding."  *In re Gorsoan Ltd.*, 652 F. App'x 7, 9 (2d Cir. 2016) (citing *In re Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997)).  Similarly, courts have held that there is no local exhaustion requirement, and that a district court may not refuse a Section 1782 discovery request just because a foreign tribunal has not yet had the opportunity to consider discovery or rule on the admissibility of evidence that might be generated from Section 1782 discovery.  *Intel*, 542 U.S. at 261 (noting that the text of Section 1782 does not contain any generally applicable foreign-discoverability rule); *Mees*, 793 F.3d at 303 (holding that a Section 1782 applicant does not first have to try and fail at obtaining discovery in the foreign court and expressly rejecting the notion of a "'quasi-exhaustion' requirement,'" reasoning that it "'finds no support in the plain language of the statute and runs counter to its express purposes'"); *Brandi-Dohrn*, 673 F.3d at 82 ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application."); *In re Top Matrix Holdings Ltd.*, No. 18 Misc. 465 (ER), 2020 WL 248716, at *6 (S.D.N.Y. Jan. 16, 2020) ("[T]he

third *Intel* factor does not require exhaustion of remedies, discoverability, or admissibility.").
Accordingly, circumvention will not be found "merely [because] the requested documents are not
obtainable through [the foreign tribunal's] procedures."   *In re Hansainvest Hanseatische
Investment-GmbH*, 364 F. Supp. 3d 243, 251 (S.D.N.Y. 2018).

Here, Petitioners have *prima facie* established the need for discovery, which is relevant to
proving Petitioners' allegations in the Mongolian Proceedings.   Moreover, Petitioners have no
reason to believe that any provision of Mongolian civil procedure would be circumvented by
obtaining the discovery sought from this Court.  Janchivdorj Decl., ¶ 7.  The fact that the discovery
sought herein could not be obtained by Petitioners through the Mongolian Proceedings does not
weigh against this application; rather, the fact that the evidence sought is held by third parties
located in this District — and outside the Mongolian Courts jurisdiction — weighs heavily in favor
of this Court's granting of assistance.  *See Intel*, 542 U.S. at 264 ("[N]onparticipants in the foreign
proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence,
available in the United States, may be unobtainable absent § 1782(a) aid."); *In re Application
Pursuant to 28 U.S.C. Section 1782 for an Order Permitting Christen Sveaas to Take Discovery
from Dominique Levy, L & M Galleries & other non-participants for use in Actions Pending in
the Norway*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (noting that "the need for an order of discovery
from this Court is more apparent" because the third-party "would not be subject to the jurisdiction
of either the French or Norwegian court.").  As a result, the third *Intel* factor supports granting the
Petition.

### 4.     The Fourth *Intel* Factor Favors Granting Discovery

Finally, Petitioners' discovery requests are not "unduly intrusive or burdensome."  *Intel*,
542 U.S. at 245.  A district court evaluating a Section 1782 discovery request should assess
whether the discovery sought is overbroad or unduly burdensome by applying the familiar

standards of Rule 26 of the Federal Rules of Civil Procedure.  *Mees*, 793 F.3d at 302; *In re Catalyst Managerial Servs.*, DMCC, 680 F. App'x 37, 39 (2d Cir. 2017) (noting that "any proportionality analysis depends upon the relevance of the information sought").  To the extent that a district court finds that a discovery request is overbroad, the remedy is not to deny the request, but rather consider whether the defect can be cured through a more limited grant of discovery.  *Id.*; *In re Euromepa*, 51 F.3d at 1101 ("[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright.").  This includes the use of confidentiality stipulations and protective orders.  *In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 252 (2d Cir. 2019) (requiring respondent to show reasons that its concerns could not otherwise be addressed through a protective order); *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 522 (S.D.N.Y. 2016) (noting that confidentiality issues should be addressed by a protective order).

Petitioners seek electronically-maintained wire transfer information concerning transactions involving specifically-identified individuals.  The broad timeframe of information sought has been necessitated by the fact that the fraudulent conduct alleged was deliberately hidden from Petitioners for such a long period of time (as some of the alleged wrongdoing occurred as early as 2010), as well as the nature of the exercise for which the information sought is to be used.  Specifically, Petitioners require a comprehensive understanding of the flow of funds over time between and among Batbold and the various Batbold Proxies in order to (i) demonstrate the links between those individuals and entities and (ii) directly link certain assets currently held by Batbold and/or his proxies to funds illegally diverted from Petitioners.  Although Petitioners believe that the information sought is likely readily retrievable with relatively little burden, any legitimate

concerns about the burden that may arise after JPMorgan conducts a reasonable search of their records can be managed through the meet and confer process, in which Petitioners will engage in good faith.

In sum, Petitioners meet all of the necessary elements required to obtain discovery pursuant to Section 1782 — and all relevant discretionary considerations weigh in favor of granting this Petition.

## III.   CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant the Petition authorizing Petitioners to issue the Subpoena to JPMorgan in the form attached hereto as **Exhibit A**, and grant any such other and further relief as this Court deems just and proper.

Dated: February 11, 2021
New York, New York

Respectfully submitted,

James E. Berger
Charlene C. Sun
Joshua S. Wan
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Tel: (212) 556-2202
Fax: (212) 556-2222
*jberger@kslaw.com*
*csun@kslaw.com*
*jwan@kslaw.com*

*Attorneys for Petitioners*