**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* Petition of<br><br>Agency for Policy Coordination on State Property; Erdenet Mining Corporation; Erdenes Oyu Tolgoi LLC<br><br>For an Order to Take Discovery from JPMorgan Chase Bank, N.A.<br><br>Pursuant to 28 U.S.C. § 1782 in Aid of a Foreign Proceeding | Civil Action No. _____<br><br><br>**Declaration of Sarah Y. Walker in support of *Ex Parte* Petition for an Order Directing Discovery from JPMorgan Chase Bank, N.A. Pursuant to 28 U.S.C. § 1782** |

I, Sarah Yasmin Walker, declare as follows:

1.      I am a solicitor duly admitted to practice in England & Wales and a partner at King & Spalding International LLP.  I am counsel for the Agency for Policy Coordination on State Property (the "Agency"), Erdenet Mining Corporation ("Erdenet"), and Erdenes Oyu Tolgoi LLC ("EOT") ("Petitioners") in proceedings currently pending in the English High Court in London, England.  I also serve as coordinating counsel for Petitioners in connection with related litigation proceedings pending in several other jurisdictions.

2.      Petitioners, who represent the Mongolian State's interests in two mining projects in Mongolia, are claimants in an ongoing civil proceeding in the First Instance Court of Bayanzurkh District in Ulaanbaatar against Batbold Sukhbaatar ("Batbold"), a former prime minister of Mongolia (the "Mongolian Proceeding").  The other Defendants in the Mongolian Proceeding are:  Ganzorig Chimiddorj, Tuul Ulambayar, Nyamdalai Ochirbat, Cheong Choo Young, Kim Hak Seon, Kim Yoonjung, Lee Yu Jeong, Rhee Byung Wook, Kang Eun Joo,

Battushig Batbold, Catrison Limited, Cliveden Trading AG, and Genetrade Limited. (the "Mongolian Defendants").

3.      Petitioners allege that the Mongolian Defendants, through a series of illegal and fraudulent transactions related to two of the most valuable and prized natural resources in Mongolia, the Erdenet and Oyu Tolgoi mines, have caused harm to the Petitioners, and by extension, to the people of Mongolia.  After executing these transactions and diverting assets belonging to Petitioners to accounts within their own control, the Mongolian Defendants further transferred, disguised, and concealed the ownership of their ill-gotten gains, including through the use of a complex network of offshore and onshore corporate structures and proxies across numerous jurisdictions.

4.      As noted above, I coordinate and oversee the various proceedings in which Petitioners are involved on their behalf.  The facts set forth herein are personally known to me, and, if called as a witness, I could and would testify competently thereto. Where I rely on information provided by others, I identify the source of information which is true to the best of my knowledge, information and belief.

5.      By this Petition, Petitioners seek leave to serve a subpoena *duces tecum* on JPMorgan Chase Bank, N.A. ("JPMorgan") to obtain documentation that  JPMorgan is likely in possession of insofar as it served as a correspondent bank for processing payments flowing from some of these allegedly illegal transactions.  Petitioners seek disclosure of, among other things, wire transfer evidence of payments involving the Mongolian Defendants and other entities involved in facilitating Defendants' efforts to conceal assets flowing from those illegal transactions, which is likely to aid Petitioners in (i) further demonstrating the strong links between Batbold and the other Mongolian Defendants, (ii) establishing how Batbold and the other

Defendants profited from the self-dealing and fraudulent conduct alleged by Petitioners and (iii) proving the quantum of such profit.  Petitioners intend to use this information in the Mongolian Proceeding, and potentially in other proceedings related to the facts at issue that are pending in other foreign countries or within reasonable contemplation.

## I.      FACTUAL BACKGROUND

### A.      THE PETITIONERS

6.      The Agency is the Mongolian government agency that owns and manages state-owned enterprises in various industry sectors, including energy production, mining, and transport. The Agency is the 100 percent shareholder of Erdenet.[1]

7.      Erdenet is a state-owned mining company that owns Mongolia's mining interests in the Erdenet mine, one of the largest copper and molybdenum mines in the world.

8.      EOT is a 34% shareholder of Oyu Tolgoi LLC, the project company that controls the operation of the Oyu Tolgoi mine, a copper-gold project in Mongolia's Ömnögovi Province in the South Gobi Desert and one of the world's largest new copper-gold mines.  In December 2011, during his tenure as Prime Minister of Mongolia, Mongolian Defendant Batbold created EOT to hold the Mongolian State's share in the Oyu Tolgoi project.

9.      In the Mongolian Proceeding and elsewhere, Petitioners are represented by the Metropolitan Prosecutor's Office, which is a subdivision of the office of the Prosecutor General of Mongolia.

---

[1] At the time of the events described below, Erdenet was co-owned by the State Property Committee of the Mongolian government (51%) and Russian state-owned entity the State Corporation for Assistance to Development, Production and Export of Advanced Technology Industrial Product ("Rostec"). On January 15, 2018, Erdenet became 100% owned by the Agency.

### B.    THE MONGOLIAN PROCEEDING

10.    On October 14, 2020, Petitioners, represented by the Metropolitan Prosecutor's Office, filed a claim before the Mongolian Court against the Mongolian Defendants to recover assets illegally diverted by the Mongolian Defendants.[2]   On October 28, 2020, the Mongolian Court issued a judicial decree initiating a civil case based on the Mongolian Complaint.  True and correct copies of the Mongolian claim and the judicial decree are attached hereto as **Exhibits 1 and 2**, respectively.[3]  Batbold was served with the Mongolian Complaint and supporting papers on November 3, 2020.

### 1.    The Mongolian Defendants

#### a.    Batbold Sukhbaatar

11.    Batbold is a former Prime Minister of Mongolia (between October 2009 and August 2012), a current sitting member of the Mongolian parliament, and a businessman.  Batbold has held several powerful political positions in Mongolia and in the Mongolian People's Party, including Minister of Foreign Affairs (2008-2009), Minister of Industry and Trade (2004-2006), and Member of the Leadership Council of the Mongolian People's Revolutionary Party (the former name of the Mongolian People's Party) (2001-2005).  During Batbold's tenure as Prime Minister from 2009 to 2012, he had effective control of the country's natural resources, and through his own wrongful actions, as well as through actions of others acting in concert with him or taken on his behalf, Petitioners allege that Batbold wrongfully diverted very significant assets owned by the Petitioners to accounts held by others on his behalf, for his benefit, and/or under his direction.

---

[2] The defendants to the Mongolian Claim are Batbold Sukhbaatar, Ganzorig Chimiddorj, Tuul Ulambayar, Nyamdalai Ochirbat, Cheong Choo Young, Kim Hak Seon, Kim Yoonjung, Lee Yu Jeong, Rhee Byung Wook, Kang Eun Joo, Battushig Batbold, Catrison Limited, Cliveden Trading AG, and Genetrade Limited.

[3] Personal identifying information has been redacted from Exhibit 1.

**b.    Batbold Proxies**

12.    The other Mongolian Defendants are primarily individuals and entities who assisted or acted for the benefit of Batbold, including by (i) facilitating the diversion of the Petitioners' assets; and (ii) holding funds or assets for the ultimate beneficial ownership of Batbold, including funds derived from the sale of the Petitioners' valuable natural resources and from illegal kickbacks that Batbold received ("Batbold Proxies").

13.    Two key Batbold Proxies are Mongolian Defendants Cheong Choo Young ("Cheong") and Kim Hak Seon ("Kim"), a husband-and-wife duo of South Korean nationality who currently reside in Hong Kong.  Cheong worked for Samsung Construction & Trading Corporation C&T ("Samsung") from 1987 to 2007. For five years during that period, Cheong worked in Mongolia at "ERDSAM," a copper joint venture between Erdenet and Samsung.  Cheong's wife, Kim, is a linguistics academic by background who moved to Mongolia to join her husband, Cheong. Kim has no apparent prior experience or specialist knowledge about the mining industry.

14.    Cheong left Samsung on February 1, 2007, returned to Mongolia (from Korea) and, Petitioners believe, began working as a proxy for Batbold.  Without the apparent means to do so, they couple appear to have gone straight from a modest household income at the beginning of 2007, when Cheong gave up his employment, to purchasing just under $30 million of copper concentrate (through a newly-incorporated Hong Kong company) by the end of that same year. Since then, Petitioners allege that Cheong and Kim have been connected to countless offshore and onshore companies incorporated in several jurisdictions around the world.  Further, and as explained in paragraph 30 below, they control and/or exercise material influence over (whether now or at one point) real estate worth at least $55 million in, among other places, New York,  Hong Kong, London and Thailand.   Batbold is also tied to many of these companies and properties.

      2. **Erdenet Mine Scheme:  Defendants' Corrupt and Illegal Transactions Relating to the Erdenet Mine**

15.     In or around 2019, Petitioners discovered that the Mongolian Defendants had concluded transactions with several foreign legal entities that Petitioners believe were designed primarily to unlawfully enrich Batbold.  Specifically, they discovered that Erdenet had entered into valuable contracts for the trade of copper and molybdenum concentrate with at least four newly formed companies: Catrison Limited ("Catrison"), Cliveden Trading AG ("Cliveden"), Genetrade Limited ("Genetrade").  Although Catrison, Cliveden, and Genetrade are based, respectively, in Hong Kong, Switzerland, and the BVI, Petitioners believe that they are controlled on behalf of Batbold by Mongolian Defendants Cheong and Kim.  Petitioners allege that, at the time of the alleged wrongdoing, Batbold oversaw the State Property Committee (the precursor to the Agency), which was majority owner of Erdenet.  Petitioners allege that these "insider" transactions allowed Batbold and his proxies to profit directly from these contracts, and that, contrary to Mongolian law, Batbold failed to disclose his involvement with, or links to, these companies in his annual asset disclosure, required of members of the Mongolian Parliament.

      a. **Erdenet's Contracts with Genetrade**

16.     As explained above, in November 2010, Cheong set up a BVI entity called Genetrade Limited in consultation with, and with the approval of, Batbold's then personal banking relationship manager, Yuan Wang ("Wang") (and a true and correct copy of a letter from Wang showing that he was Batbold's personal relationship manager at the time is attached hereto as **Exhibit 3**).[4]

---

[4] Personal identifying information has been redacted from this exhibit.

17.    As explained in paragraphs 42 to 47 below, it appears from email correspondence that Cheong and Wang decided that the company should be fronted by someone called Kang Eun Joo ("Kang") who, like Cheong, is a South Korean citizen, a former employee of Samsung, and a suspected proxy of Batbold.    Genetrade's sole shareholder was Grandcastle Assets Inc ("Grandcastle"), a company in which both Batbold and his eldest son, Battushig Batbold ("Battushig"), maintained beneficial ownership interests.

18.    Shortly after it was incorporated, Genetrade was awarded its first sales contract by Erdenet, on December 24, 2010, for the purchase of 3,300 wet metric tons ("WMT") of molybdenum flotation concentrates.  On December 6, 2011, Genetrade obtained a second contract with Erdenet, again signed by Ganzorig and Kang, for the purchase of 3,800 WMT of molybdenum flotation concentrates (collectively, the Genetrade Contracts).  Batbold and Battushig were the ultimate beneficial owners of Genetrade throughout this period. True and correct copies of the Genetrade Contracts are attached hereto as **Exhibit 4**.

19.    Pursuant to the Genetrade Contracts, Erdenet sold 6,967.258 WMT of molybdenum flotation concentrates to Genetrade at a total cost of $68,428,437.56 million.  Each of the Genetrade contracts is denominated in U.S. Dollars.  Petitioners believe that Genetrade ultimately re-sold molybdenum concentrate to foreign buyers.

### b.    Erdenet's Contracts with Catrison

20.    Catrison Limited is an active Hong Kong company established by Batbold Proxies. It was established on February 8, 2011, and is and has been controlled from time to time by Kim, among others.  Kim maintained and used the e-mail address "catrisonlimited@yahoo.com" to communicate with Batbold and his son Battushig.  Batbold did not use his official parliamentary e-mail address to communicate with Kim, but instead used his personal Yahoo e-mail address. Even though he does not appear to hold any official position in Catrison, Cheong has

communicated with Erdenet on behalf of Catrison.  A true and correct copy of a report documenting these email communications, prepared by technology consultancy Greylist Trace Limited, is attached hereto as **Exhibit 5**.

21.    On February 14, 2011, Catrison secured a contract with Erdenet to purchase 150,000 WMT of copper concentrates from Erdenet over a period of three years (the "First Catrison Contract").  At the time the First Catrison Contract was executed, Catrison had existed for less than a week and did not have any history of trading in copper concentrates.  Neither Catrison's sole shareholder, Kim, or its then sole director, another Batbold Proxy (and Mongolian Defendant) named Kim Yoonjung ("Yoonjung"), at the time had any prior experience or technical expertise in copper concentrates.  Petitioners are unable to ascertain how Kim, Yoonjung, or Catrison obtained financing to purchase copper concentrates from Erdenet, as there is no indication that either individual then (or now) possessed the personal funds or the creditworthiness to secure such financing for such a significant commodities transaction.  The same parties subsequently executed a second contract on December 14, 2011 (the "Second Catrison Contract"), under which Catrison agreed to purchase 240,000 WMT over three years.  True and correct copies of the Catrison contracts are attached hereto as **Exhibit 6**.

22.    In 2011, Erdenet sold 45,027.25 WMT of copper concentrates to Catrison at a total cost of $68,974,595.58.  In 2012, Erdenet sold an additional 63,831.91 WMT of copper concentrates at a total cost of $92,935,795.53.  Almost immediately after entering into each of these sales contracts, Catrison re-sold some or all of the copper concentrates that it purchased from Erdenet to Ocean Partners UK Limited ("OPUK"), a UK-based commodities trading company. Before and after contracting with Catrison, Erdenet sold copper concentrates directly to OPUK, which was one of Erdenet's largest customers.  Petitioners believe that the fact that Erdenet

suddenly began awarding contracts to Catrison, a new entity controlled by individuals connected to Batbold and with no experience in the industry, instead of continuing to sell directly to OPUK, as it had done previously, is highly unusual.  Individuals from OPUK's affiliate in the United States, Ocean Partners USA, were in direct contact with Catrison and, at times, even handled shipments and communications with Erdenet on behalf of Catrison.  In a cryptic email to Erdenet, one individual from Ocean Partners USA stated that the Catrison shipments were "not well discussed," and ended her email with the words "I don't wish to cause any problems discussing the 'c' shipments."  True and correct copies of email correspondence between Ocean Partners representatives and Erdenet are attached hereto as **Exhibit 7**.[5]

23.     Each of the Catrison contracts was denominated in U.S. Dollars, and Petitioners are aware that the Mongolian Defendants executed numerous transactions in U.S. Dollars pursuant to these contracts.  Petitioners believe that these large transactions, which involved purchases of copper concentrates valued in the hundreds of millions of dollars, involved several steps, including obtaining financing, purchasing copper concentrates from Erdenet, and reselling to other entities. While Petitioners do not have currently have comprehensive evidence about Catrison's financing arrangements, they are aware that at least some of these transactions were facilitated by banks in New York.  Namely, according to the Second Amendment to the Second Catrison Contract (a true and correct copy of which is attached hereto as **Exhibit 8**), JP Morgan Chase NA, with an address as 1 Chase Manhattan Plaza, New York, NY 10081, was used as an intermediary bank for payments made by Erdenet to Catrison.  As a result, Petitioners believe that JPMorgan served as an intermediary bank for certain payments made in connection with the Catrison contracts.

---

[5] Personal identifying information has been redacted from this exhibit.

### c.     Erdenet's Contracts with Cliveden

24.     Cliveden is a Swiss company that was established on December 9, 2011.  On January 26, 2012, Kim was appointed as director of Cliveden.  Petitioners alleged that, from January 2012 until at least September 2016, Cliveden was controlled by Batbold Proxies Kim and/or Eoin Barry Saadien, either through their respective executive positions in Cliveden itself or through Kim's ownership of a Hong Kong company (Ever Global Trading Limited ("Ever Global")), which itself held a substantial shareholding in Cliveden (between 26 January 2012 and 22 September 2016).  During that time, Cliveden concluded two contracts with Erdenet for the purchase of copper concentrates.  Petitioners believe that Batbold and his family were in contact with the key players at Cliveden.  In particular, Petitioners are aware that Kim was in communication with both Batbold and Battushig.  In addition, Mark Forsyth, using the e-mail address "Clivedenmongolia@gmail.com," communicated with Batbold.  Batbold again did not use his official parliamentary e-mail address to communicate with Kim and Mark Forsyth, but instead used his personal Yahoo e-mail address.  True and correct copies of the Cliveden contracts are attached hereto as **Exhibit 9**.

### 3.     Oyu Tolgoi Mine Scheme:  Defendants Received Undisclosed Illegal Kickbacks in Exchange for Favors from the Government Relating to the Oyu Tolgoi Mine

25.     Petitioners further allege that, at key points during the commercial life of the Oyu Tolgoi mine, the Mongolian Defendants (on behalf of Batbold) illegally received assets from offshore and onshore companies in return for favors granted to, among others, the private shareholder and operator of the Oyu Tolgoi mine, Canadian mining company Ivanhoe Mines Limited ("Ivanhoe").

26.     First, in the summer and fall of 2010, when the board of the project company, Oyu Tolgoi LLC, was selected, and Batbold made an important and highly publicized site visit to the

Oyu Tolgoi mine, individuals linked to Ivanhoe registered a series of offshore corporate entities that they would later use to transfer assets or make payments to Batbold proxies.

27.     Second, around December 2010, when the Mongolian government was negotiating with Ivanhoe and Rio Tinto about the ownership and management of the mine – Ivanhoe-linked individuals and entities transferred assets to Batbold proxies.  Petitioners are aware that many of the payments and asset transfers to Batbold's proxies were made in U.S. Dollars.

28.     Third, around June 2011, when further negotiations over the financing and management of the mine took place, Ivanhoe-linked individuals made several transfers of assets and cash to entities believed to be controlled by Batbold and his proxies.

### 4.     Connections Between Batbold and His Proxies

29.     As discussed above, Cheong and Kim were heavily involved in facilitating Batbold's misconduct in the Erdenet and Oyu Tolgoi Schemes.  As summarized below, there is strong evidence linking Cheong and Kim to Batbold and Batbold's family in various different circumstances, which tends to show that they act as his proxies.

#### (i)     Real Estate held on Batbold's Behalf

30.     First, Cheong and Kim control real estate that they themselves do not appear to visit but that Batbold and his family appear to visit and/or live in.

a.  London:  In 2006, while Batbold was Minister of Trade and Industry, documents evidence that Batbold purchased two apartments in London, Apartments 711 and 716 in Knightsbridge (the "Knightsbridge Apartments"), and true and correct copies of  the property ownership records for those apartments are attached hereto as **Exhibit 10**.  The Knightsbridge Apartments are used by Batbold's family.  For example, Samadi Batbold, one of Batbold's sons, used Apartment 711 as his

registered address in his application for a U.K. driving license, and a true and correct copy of that license, which was issued on April 9, 2015, is attached hereto as **Exhibit 11**.[6]  Despite Batbold's initial purchase and his and his family's use of these properties, it is Cheong that held/holds legal title to both apartments.  *See*, for example, true and correct copies of property transfer and registry records for the Knightsbridge Apartments attached hereto as **Exhibit 12**.

   b. <u>New York</u>: Cheong and Kim control two valuable apartments in Manhattan that were acquired in November 2012 and March 2015, around the time that Batbold's children Battushig and Badamkhand studied in Boston. True and correct copies of a property records search of Cheong and the purchase documents for the two New York apartments are attached hereto as **Exhibit 13**.  I have seen no evidence of Cheong or Kim using these apartments.

   c. <u>Thailand</u>: Kim controls two villas and three apartments at a luxury development on Phuket Island. Batbold and his family have visited one of the villas almost every New Year's Eve since 2014, as well as during the year, but I have seen no evidence of Cheong or Kim ever doing so.  True and correct copies of: (i) the Thai property deed; and the 2020 annual returns for (iii) Bynar Limited and (iv) Cherskiy Limited (two Jersey entities that Kim and Cheong own which hold leasehold interests in Thai villas), are attached hereto as **Exhibit 14**.

---

[6] Personal identifying information has been redacted from this exhibit.

### (ii)   Corporate Connections with Batbold

31.     Second, Cheong and Kim have a wide array of corporate connections with Batbold and his family.  For present purposes, it suffices to expand upon four key examples: (i) Premier Edge Limited, (ii) Winrock Limited, (iii) Genetrade Limited, and (iv) Elmbridge Assets Limited.

**(1) Premier Edge Limited**

32.     Batbold was the sole shareholder of a BVI company called Premier Edge Limited ("Premier Edge") from its formation on August 15, 2005, until April 25, 2006, coinciding with the period when Batbold was Minister of Trade and Industry in Mongolia.  During the same period, Premier Edge purchased the two valuable Knightsbridge Apartments referenced in paragraph 30 above on February 23 and March 8, 2006, respectively. A true and correct copy of the Premier Edge register of members is attached hereto as **Exhibit 15**.

33.     Documents evidence that, in March 2006, Batbold began to set up an offshore trust structure called the "Quantum Lake Trust." A true and correct copy of a letter establishing this trust is hereto attached as **Exhibit 7**.   In April 2006, three months before Mongolia's Anti-Corruption Law—a true and correct copy of which is attached hereto as **Exhibit 16**— was passed, Batbold transferred his shares in Premier Edge to a BVI nominee company, Regula Limited ("Regula").  On June 11, 2015, legal ownership of the shares of Premier Edge passed from Regula to Batbold's son, Battushig.  A few months later, on October 6, 2015, Premier Edge appeared to have issued more shares, and both Battushig and his brother, Samadi, became shareholders. These transfers are evidenced in the Premier Edge register of members, of which a true and correct copy is attached hereto as **Exhibit 15**.

34.     Despite these apparent transfers in legal ownership, Batbold remained the beneficial owner of Premier Edge (and, in turn, the Knightsbridge Apartments), as evidenced by a

July 2015 email exchange between the manager of the Quantum Lake Trust and Premier Edge's registered agent,  disclosing Batbold as the beneficial owner of the shares of Premier Edge. A true and correct copy of that email exchange and the accompanying attachments is attached hereto as **Exhibit 17**.  Just over a year later, on 8 August 2016, Batbold's sons "sold" the shares in their names in Premier Edge (which still controlled both Knightsbridge Apartments) to Lorsch, another BVI company owned by Cheong.  Lorsch acquired 100% of the shares in Premier Edge for the sum of GBP 1 million, which represented approximately one-fifteenth of the value of the $15 million worth of London property legally held by Premier Edge at the time.  This transfer is also evidenced in the Premier Edge register of members, of which a true and correct copy is attached hereto as **Exhibit 15**.

35.     On the same date that the shares of Premier Edge were transferred to Lorsch, Cheong was appointed director of Premier Edge, according to a true and correct copy of the BVI registration documents attached hereto as **Exhibit 18**.[7]  Cheong was now sole shareholder and director of Premier Edge, and therefore in ostensible control of both the Knightsbridge Apartments, his company Lorsch having acquired them for what appears to be a significant undervalue.

36.     A year later, in November 2017, Premier Edge sold Apartment 711 to a third party, presently presumed to be unrelated, for the sum of GBP 1.85 million (then approximately $2.5 million), almost twice as much as Lorsch had paid for the shares in Premier Edge (*i.e.*, for *both* properties) just a year earlier. In August 2018, under the directorship of Cheong, Premier Edge transferred Apartment 716 to its sole shareholder Lorsch (which, as explained above, Cheong also controls). True and correct copies of the property transfer records are attached hereto as **Exhibit 12**.

---

[7] Personal identifying information has been redacted from this exhibit.

37.     It is clear from the corporate records and other evidence now available that Batbold is and has been the ultimate beneficial owner of Premier Edge (and therefore the Knightsbridge Apartments) throughout, first in his own name, then through Regula, then through his sons, and now through Lorsch and Cheong.

**(2) Winrock Invest Limited**

38.     Winrock is a BVI company that was incorporated on July 4, 2006.  A true and correct copy of the certificate of incorporation is attached hereto as **Exhibit 19**. Documentary evidence establishes that Batbold was the 100% shareholder and director of Winrock between September 8, 2006 and November 1, 2006, during which period he was a member of Parliament. The application for shares and consent to act as a director of Winrock are both signed by Batbold himself. True and correct copies of (i) Batbold's application for shares of Winrock, (ii) Winrock's register of members, and (iii) Winrock's register of directors, are attached hereto as **Exhibit 20**.

39.     On November 1, 2006, the same day as the Law on Anti-Corruption in Mongolia entered into force, Batbold resigned as director of Winrock and transferred his shares to a nominee company called Cremunication Limited that he and his proxies, including Cheong, have frequently used.  The transfer of shares is, again, signed by Batbold. A true and correct copy of the transfer of shares and resignation is attached hereto as **Exhibit 21**.

40.     It is apparent that Batbold continued to control Winrock beyond November 1, 2006, even though he had transferred legal title to the shares. We note in particular the following connections between Batbold and Winrock.  Since November 1, 2006, Winrock has been the 100% shareholder of another BVI company named Moonbell Group Ltd ("Moonbell Group"), of which Cheong later became a director in August 2012.  Moonbell Group, in turn, wholly owns Moonbell LLC, which uses as its registered address the address of Batbold's Chinggis Khaan Hotel. There

is also evidence of Batbold directing the activities of Moonbell Group.  For example, on August 31, 2008, Batbold signed a request to change Moonbell Group's address to "c/o Winrock Invest Ltd, 2/F Eton Tower, 8 Hysan Avenue, Causeway Bay, Hong Kong."  True and correct copies of (i) Batbold's application for shares of Moonbell Group, (ii) a letter from Cheong to Moonbell Group consenting to act as a director, (iii) a 2006 Moonbell Group shareholder's resolution, (iv) Moonbell Group's Mongolian registration, and (v) Batbold's letter are attached hereto as **Exhibit 21**.

41.     It appears that Cheong was engaged as a mere nominee "owner" of Winrock when Batbold purported to relinquish ownership of his shares once the Mongolian Anti-Corruption Law came into effect.

a.   On January 27, 2007, just three months after Batbold nominally relinquished control of Winrock, Cheong registered the web domain "moonbell.net" through his Hong Kong company, Lanca Holdings Limited, and later became a director of both Moonbell LLC and Moonbell Group. True and correct copies of (i) Moonbell Group December 2006 shareholder's resolution and (ii) a letter from Cheong to Moonbell Group consenting to act as a director are attached hereto as **Exhibit 22**.

b.   On October 14, 2009, Cheong became director of Winrock, according to a true and correct copy of Winrock's register of directors attached hereto as **Exhibit 20**.

c.   On May 2, 2012, Cheong (as director) signed over the shares in Winrock to another Batbold Proxy and Defendant in the Mongolian Proceeding, Kim Yoonjung. A true and correct copy of the transfer of shares is attached hereto as **Exhibit 23**.

**(3) Genetrade Limited & Grandcastle Assets Inc.**

42.     The facts surrounding Genetrade and Grandcastle Assets Inc. ("Grandcastle") show that Batbold (and his son Battushig) were ultimate beneficial owners of a company that contracted with Erdenet while Batbold was prime minister, and that Batbold tried to obscure his identity as a beneficiary of this arrangement by interposing his proxies.

43.     On September 8, 2006, a company called Grandcastle Assets Inc. ("Grandcastle") was incorporated in the BVI, and a true and correct copy of a records search is attached hereto as **Exhibit 24**.  Battushig, Batbold's eldest son, served as Grandcastle's sole shareholder and director from at least January 22, 2007.  True and correct copies of (i) Grandcastle's December 21, 2006, appointment of first director, (ii) a January 22, 2007, Grandcastle resolution, and (iii) a January 22, 2007, letter from Battushig to Grandcastle, are attached hereto as **Exhibit 25**.  At the time he was serving as a director of Grandcastle, Battushig was studying at the University of Chicago, according to the true and correct copy of his curriculum vitae attached hereto as **Exhibit 26**.  Batbold himself appears to have been a beneficial owner of Grandcastle, along with his son:

    a.  Both Batbold and Battushig are listed as "Beneficial Owner(s)" in the internal correspondence of Grandcastle's BVI agent, according to a true and correct copy of a March 3, 2009, letter from Phoena Siu to Samuel Hodge and Lesia Grazette, attached hereto as **Exhibit 27**.[8]

    b.  A letter of recommendation in respect of Batbold from Yuan Wang is included among Grandcastle's corporate documents, and a true and correct copy is attached hereto as **Exhibit 3**.

---

[8] Personal identifying information has been redacted from this exhibit.

c.  An invoice from Trident Trust (Grandcastle's corporate agent) to Grandcastle is addressed to "*c/o Winrock Invest Ltd, Room 19, 2/F, Eton Tower, 8 Hysan Avenue, Causeway Bay, Hong Kong*," and a true and correct copy is attached hereto as **Exhibit 28**.  As explained above, Winrock is a BVI company of which Batbold is beneficial owner.  Further, a Business Internet Banking receipt shows that Trident Trust received a payment relating to Grandcastle Assets on September 18, 2009 of $350 by order of Winrock Invest. A true and correct copy of that banking receipt is attached hereto as **Exhibit 29**.

44.    On September 9, 2009, Yuan Wang (Batbold's personal relationship manager) explained in an internal email that the "BO" (i.e. beneficial owner) of Grandcastle wanted to change its agent from Trident Trust Company (BVI) Ltd to NovaSage Incorporations (BVI) Ltd. Trident Trust employees explained, in internal correspondence, their belief that "*the client decided to change the Registered Agent / Registered Office of the Company in order to avoid our due diligence requirement[s]*."  True and correct copies of the email exchanges are attached hereto as **Exhibit 30**.

45.    In late November 2010, Cheong formed the BVI company Genetrade in consultation with, and with the approval of, Batbold's then personal banking relationship manager, Yuan Wang.  This process is evident from several emails between Cheong, Wang, and a corporate service provider representative (Kitty Chan), a true and correct copy of which are attached hereto as **Exhibit 31**.[9]  Grandcastle was the sole shareholder of Genetrade and Batbold Proxy Kang Eun Joo was appointed director.  True and correct copies of a records search report for Genetrade, as well as its register of directors and register of members are attached hereto as **Exhibit 32**.

---

[9] Personal identifying information has been redacted from this exhibit.

46.     The following month, on or around December 24, 2010, Kang contacted Erdenet to discuss the possibility of signing a contract for the purchase of molybdenum concentrates. A true and correct copy of Kang's emails, along with a document she attached summarizing Genetrade, are attached hereto as **Exhibit** 33.  Although Kang provided an elaborate narrative about Genetrade and its various senior figures, she did not mention that its ultimate beneficial owners were the then-Prime Minister of Mongolia and his son.

47.     As explained further below, on December 24, 2010, and December 6, 2011, Genetrade obtained contacts with Erdenet for the purchase of over 7,000 WMT of molybdenum concentrates.  Erdenet made total deliveries of 6,967.258 WMT at a total cost of over $68 million.

**(4) Elmbridge Assets Limited**

48.     Mongolian company Biluutmining LLC ("Biluutmining") currently owns a mining license—a true and correct copy is attached hereto as **Exhibit 34**—which covers molybdenum deposits across 79.80 hectares of land in eastern Mongolia.  It appears that Batbold used Cheong to hold this mining licence on his behalf as mere nominee through a BVI company called Elmbridge Assets Ltd ("Elmbridge").

49.     Elmbridge was incorporated on July 28, 2009.  Although Batbold is not mentioned anywhere on the register of directors or register of shareholders, an organizational chart kept among the corporate documents held by the corporate service provider and secured by Petitioners by way of a BVI court order reveals that, shortly after incorporation and while he was Minister of Foreign Affairs (with all of the obligations that entails), Batbold was stated to be Elmbridge's sole "beneficial owner."  True and correct copies of Elmbridge's register of directors, register of members, and organizational chart are attached as **Exhibit 35**.

50.     Elmbridge's business address appears to be "Suite 19, 2/F, Eton Tower," according to a true and correct copy of transactional records attached hereto as **Exhibit 36**.[10] This is the same address used by two other companies which evidence shows are beneficially owned by Batbold: Winrock and Moonbell Group.  This is also the address that Batbold, his wife and son (Battushig) provided for their HSBC Premier accounts in Hong Kong, according to the true and correct copies of bank statements attached hereto as **Exhibit 35**.[11]

51.     There are two ways in which Elmbridge held shares in Biluutmining:

a.   First, the day after incorporation, Elmbridge acquired an indirect 50% shareholding in Biluutmining through the acquisition of several companies to which Cheong was linked. Between July 29, 2009 and April 12, 2011, Elmbridge was the 100% shareholder of a company called Bisley Development Limited ("Bisley").  Cheong served as a director of Bisley between May 24, 2010, and October 19, 2011.  Since June 30, 2010, Bisley has been the 100% shareholder of the Mongolian company Gyantbayalag LLC and, since April 29, 2008, Gyantbayalag has been a 50% shareholder of the Mongolian company Biluutmining LLC.  True and correct copies of Bisley's (i) register of members and (ii) register of directors, as well as Mongolian registrations of (iii) Gyantbayalag LLC and (iv) Biluutmining LLC, are attached hereto as **Exhibit 37**.

b.   Second, in July 2011, just before Batbold became prime minister of Mongolia, Elmbridge bought a 12.5% stake in Biluutmining by routing just under $2.75

---

[10] Personal identifying information has been redacted from this exhibit.

[11] Personal identifying information has been redacted from this exhibit.

million through a series of Mongolian companies (PAM LLC and Monnismining LLC) in which Cheong was involved.[12]

### C.   OTHER FOREIGN PROCEEDINGS

52.     After the Mongolian Court initiated the case against the Mongolian Defendants, Petitioners sought and obtained freezing injunctions valued at approximately $70 million against Batbold and others in England & Wales, Hong Kong, Jersey, and Singapore.  Even though Batbold Proxies Cheong and Kim appear to control (or did so, at one point) at least $55 million worth of real estate, Petitioners allege that Batbold – in conjunction with proxies *other than* Cheong and Kim – controls well over this amount, hence the $70 million figure. Petitioners also obtained, through a settlement entered after the commencement of litigation in the Supreme Court of New York, New York County, agreement by the record owners of assets in New York (in which Petitioners believe Batbold, through corporate proxies owned and controlled by Cheong, holds a beneficial interest) not to dispose of those assets without prior notice to Petitioners.  Further, Petitioners obtained disclosure in the BVI from offshore corporate service providers used by Batbold.  I summarize these proceedings below.

53.     England & Wales: On November 18, 2020, an English court issued a freezing Injunction against (i) Batbold and Cheong, with regard to their UK assets up to a value of $20 million, and (ii) BVI company Lorsch Limited (registered owner of a luxury property in London

---

[12] On July 22, 2011, Elmbridge made one payment of $2,749,993 to a USD account number held by PAM LLC at a Mongolian bank. This transfer funded a $2.75 million payment made by PAM LLC to Monnismining LLC on July 25, 2011.  PAM LLC agreed to loan Monnismining LLC $2.75 million for the purpose of purchasing 12.5% of the shares of Biluutmining LLC. Cheong has been involved in PAM LLC (as director) and Monnismining LLC (50% owned by PAM LLC, where Cheong served as a director). Cheong was also director of Biluutmining at this time. Batbold still indirectly holds (at least) a 6.3% share in Biluutmining through PAM LLC.  True and correct copies of (i) transaction records from PAM LLC's USD bank account, (ii) the Mongolian registration of Biluutmining LLC, (iii) a July 26, 2011, loan agreement between PAM LLC and Monnis Mining LLC, (iv) Mongolian records relating to PAM LLC, (v) Mongolian records relating to Monnismining LLC, are attached hereto as **Exhibits 36 and 37**.

that Batbold owned/ his family have used).  A true and correct copy of the judgment relating to the freezing Injunction is attached hereto as **Exhibit 38**. The judge said that this was a case in which it was "*plainly appropriate*" to grant injunctive relief, and he made key factual findings (albeit on an interim basis) that validated the Petitioners' core contentions: that Batbold, using a network of proxies (including Cheong and Kim), has committed wrongdoing in relation to the Erdenet and Oyu Tolgoi mines, and has used the fruits of his wrongdoing to acquire substantial assets around the world that he has "*dishonestly conceal[ed]*." *Id.*, ¶¶ 13, 17.  The injunction ordered by the court remains in place against all Defendants.  Further evidence related to the Knightsbridge Properties (and supportive of Petitioners' contentions) has since been secured by way of the BVI court order.

54.    Hong Kong:  On November 23, 2020, a Hong Kong court issued a freezing injunction against Batbold, Cheong, Kim and others up to a value of $30 million. The injunction ordered by the court remains in place against all Defendants. A true and correct copy of the Hong Kong freezing injunction is attached hereto as **Exhibit 39**.

55.    Singapore:  On November 27, 2020, a Singapore court granted a freezing injunction in support of the claim issued in Singapore against Batbold and his proxies up to $1 million. Two of the Defendants to that proceeding have applied, among other things, to set aside the freezing injunction against them.  Petitioners are vigorously defending these challenges.  In the meantime, the injunction ordered by the court remains in place against all Defendants. A true and correct copy of the Singapore freezing injunction is attached hereto as **Exhibit 40**.

56.    Jersey:  On November 24, 2020, a Jersey court issued a freezing injunction up to $16 million against Batbold, his proxies and a series of Jersey companies that ultimately hold valuable real estate in Thailand, beneficially owned by Batbold. The injunction ordered by the

court remains in place against all Defendants. A true and correct copy of the Jersey freezing injunction is attached hereto as **Exhibit 41**.

57.    <u>New York</u>:  The Mongolian Plaintiffs filed an action in New York to make sure that Batbold (or his proxies) did not transfer certain properties held by various Batbold Proxies pending the outcome of the lawsuit in Mongolia.  Petitioners secured an agreement from Batbold's proxies to provide 60 days' notice of any intended transfer such properties in exchange for withdrawing the proceedings in New York (without prejudice). A true and correct copy of the New York Stipulation is attached hereto as **Exhibit 42**.

58.    <u>British Virgin Islands</u>:  On December 14, 2020, a BVI court issued an order which obliged certain offshore corporate service providers to disclose information about Batbold's corporate activity in the BVI (as well as that of his proxies). A true and correct copy of the BVI disclosure order is attached hereto as **Exhibit 43**.

## II. RELATIONSHIP BETWEEN JPMORGAN AND THE ALLEGATIONS AGAINST DEFENDANTS

59.    Petitioners seek discovery from JPMorgan to obtain documentary evidence to establish their allegations against Defendants in the Mongolian Proceedings, including documentary evidence of the transactions and payments described above in connection with the Erdenet and Oyu Tolgoi Schemes and evidence demonstrating the flow of funds among and between the Mongolian Defendants and other individuals/entities involved in those schemes or the concealment of assets derived from those schemes.

60.    Petitioners understand that foreign originating banks generally use U.S. correspondent banks like JPMorgan when making international U.S. dollar-denominated wire transfers.  JPMorgan was identified as the designated correspondent bank for transactions under the Catrison contracts.  Moreover, each one of the undisclosed and illegal contracts between

Erdenet and Catrison, Cliveden, and Genetrade, was a U.S. Dollar contract.  Petitioners therefore believe that JPMorgan is likely to possess information about the Mongolian Defendants' U.S. dollar-denominated transactions during the relevant time period and, specifically, wire transfer information that may show the flow of funds between the multitude of individual and corporate proxies who Petitioners believe have been involved in Batbold's attempts to obscure and conceal his beneficial ownership and use of these valuable and unreported assets.

61.     Accordingly, Petitioners seek from JPMorgan wire transfer information pertaining to payments involving Catrison during the period from January 1, 2011, to date.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 11, 2021.

London, England

_____

Sarah Yasmin Walker