# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Orin Snyder
Direct: +1 212.351.2400
Fax: +1 212.351.6335
OSnyder@gibsondunn.com

March 9, 2021

VIA ELECTRONIC FILING

The Honorable Vernon S. Broderick
United States District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, New York 10007

**APPLICATION GRANTED**
**SO ORDERED**
**VERNON S. BRODERICK**
**U.S.D.J.** 12/28/2021

The parties are directed to meet and confer and submit a proposed briefing schedule to the Court on or before January 7, 2022.

Re:   *Ex Parte Application of Agency for Pol'y Coordination on State Prop., et al.*, No. 21-mc-178 (VSB)

Dear Judge Broderick,

We represent Sukhbaatar Batbold and his son Battushig Batbold, the two individuals who are being unfairly and unlawfully targeted in the above-referenced *ex parte* discovery application brought under 28 U.S.C. § 1782.[1]

Our client Sukhbaatar Batbold is the former Prime Minister of Mongolia, a current member of parliament, and one of the likely candidates of the pro-democracy Mongolian People's Party in the upcoming presidential election, named by his party officials. Our other client is his son, Battushig Batbold, a Mongolian businessman—educated at the University of Chicago and the Harvard Business School—who was recently elected to the International Olympic Committee. The Batbolds respectfully submit this letter to request the opportunity to be heard to seek urgently needed relief in advance of the Court's consideration of the *ex parte* application in this matter. Specifically, our clients seek leave to move to intervene in order to oppose the Section 1782 application—a challenge that could quickly become moot if the Court were to grant the application to obtain financial information from a third party custodian (JP Morgan Chase Bank) without first hearing our clients' substantial and meritorious objections.

This proceeding seeks discovery of financial information relating to some forty different individuals and entities. The Section 1782 request is brought by parties who have not even authorized this filing, yet they nonchalantly ask this Court to allow them to engage in a wild fishing expedition and access bank records purportedly relating to some forty individuals and

---

[1] In filing this letter or opposing the application, the Batbolds do not enter any general appearance or otherwise take any action that constitutes consent to the Court's general jurisdiction or to the filing of any substantive claims against them. The filing of this letter and any subsequent papers in this proceeding is merely for the limited purpose of opposing harassing discovery directed against the Batbolds in this forum.

March 9, 2021
Page 2

entities. That expedition is designed not to advance any legitimate foreign claims as Section 1782 requires but rather to promote a foreign disinformation scheme targeting our clients—and more broadly, to undermine democracy and the future of an entire country. This is an abuse of process. The Court should deny the Section 1782 application in full and at the very least subject these requests to the robust adversarial process the purported petitioners were hoping to avoid by proceeding—as they have in numerous countries around the world—through an *ex parte* process designed to avoid any legitimate opposition so as to rummage through bank records and secure quick judicial "victories" they can parrot at home and in the international press.

The *ex parte* application represents the latest front in a political campaign against Mr. Batbold that has been waged through a series of spurious lawsuits across the globe designed by political rivals to smear his reputation in advance of the upcoming Mongolian presidential election. Over the past four months, shadowy figures have filed a number of abusive lawsuits against our clients on multiple continents, including in London, Singapore, Hong Kong, Jersey, Mongolia, and right here in New York. These litigations, which assert baseless claims of corruption, have been filed in the name of Mongolian state actors (a state agency and two state-owned mining companies) that have expressly disclaimed any interest in the cases. Although the purported plaintiffs have not authorized the lawsuits, frivolous cases continue to be filed, and the instant application before this Court is the latest example.

The purpose of these proceedings is clear. Rather than advance any legitimate legal interests, all of these cases are designed to generate disinformation as part of a well-oiled public relations machine to undermine not only our clients' hard-won reputation for integrity and public service in Mongolia but also the integrity of Mongolian democracy itself.[2] The mastermind behind these coordinated legal attacks appears to be the current Mongolian President, Khaltmaagiin Battulga, an anti-liberal strongman who opposes democratic self-rule and views Mr. Batbold as his main political opponent in the upcoming 2021 election.[3] Battulga seeks to strengthen his stranglehold on the country and neutralize the greatest threat

---

[2] Tori Macdonald, *Iconic mine at the centre of a raging political battle*, Euroreporter (Dec. 23, 2020), https://www.eureporter.co/world/mongolia/2020/12/23/iconic-mine-at-the-centre-of-a-raging-political-battle/ (reporting that the Mongolian lawsuit appears "deliberately political" and "designed to weaken his rival Batbold's national and international standing").

[3] Battulga's efforts to sling mud at his opponents by inventing claims of financial misdeeds are transparent attempts at misdirection. Battulga seeks to draw the public eye away from credible reports that he has violated Mongolia's law prohibiting public officials or their affiliates from owning offshore assets. *See* Eric Grimes, *Under the Microscope: President's Offshore Assets Cause A Stir In Mongolia* (Dec. 27, 2020), https://intpolicydigest.org/under-the-microscope-president-s-offshore-assets-cause-a-stir-in-mongolia/.

March 9, 2021
Page 3

to his continued reign, which the pro-social democracy Mongolian People's Party and its leaders represent. To that end, Battulga has manufactured salacious and false allegations against Mr. Batbold that he has deployed in the courts, using organs of the state to do so. He has made these allegations the central focus of statements he has made before Mongolia's Parliament.[4] And he has marched his political appointees, including his deputy chief of staff, onto national television programs on stations the President's allies own to recite for the entire country the false allegations against Mr. Batbold. These television "presentations" seek to lend false credibility and notoriety to the cases against Mr. Batbold in advance of the June election.

This proceeding before Your Honor is part of the same disinformation scheme. In this Court, the petitioners parrot the same half-truths and lies they have advanced back home in Mongolia and in litigations around the world against Mr. Batbold, trying to impede his political ascension. So far, at least one court, having learned of plaintiffs' deception, has denied relief. In the New York State Supreme Court, a highly respected judge denied the continuation of plaintiffs' requested relief after Mr. Batbold revealed the fraud on the court the plaintiffs had perpetrated by filing the action on behalf of parties that had never authorized the case.[5] The "plaintiffs" soon dropped the case entirely, effectively conceding the lawsuit had been nothing more than a hoax.[6]

The Plaintiffs' abject surrender in New York State Supreme Court set off a political firestorm in Mongolia. One member of parliament falsely accused the Prime Minister's government (formed by the Mongolian People's Party, of which Mr. Batbold is a member) of

---

[4] *See Address of the President to Special Parliamentary Session Regarding PM's Resignation* (Jan. 22, 2021), https://president.mn/en/2021/01/22/address-of-the-president-to-special-parliamentary-session-regarding-pms-resignation/.

[5] The New York State case was loaded with falsehoods and inaccuracies, starting from the moment the case was filed when the plaintiffs sought an "emergency" *ex parte* application without identifying a single credible justification for such extraordinary relief. Similarly, the papers on which the plaintiffs relied were riddled with inaccurate citations, demonstrating the filings were more filler than fact and intended to project the *image* that the plaintiffs had a legal case rather than actually identify any hard facts or relevant truths. Similarly disturbing, the case was designed to hinder Mr. Batbold from launching any defense at all, including by serving Mr. Batbold well into the night on Thanksgiving Eve 2020 in a calculated gambit designed to render it more difficult for him to procure American counsel. That gamesmanship failed, and Plaintiffs ultimately had to completely surrender in the case and drop it entirely as against the Batbolds.

[6] *See also* Jake Hartnett, *What to expect from a Khurelsukh-Battulga showdown*, Mongolia Weekly (Jan. 31, 2021), https://www.mongoliaweekly.org/post/what-to-expect-from-a-khurelsukh-battulga-showdown (noting that "the timing of the allegations [in the New York case] does point to a deliberate effort to smear a political rival ahead of this summer's presidential race").

**GIBSON DUNN**

March 9, 2021
Page 4

withdrawing the case shortly before the government's resignation in early January. The MP even undertook a hunger strike to demand that the New York litigation restart. That effort culminated in the Minister of Justice—under political duress—drafting a letter on live television and sending that letter to the law firm that filed the New York case, King & Spalding LLP, demanding the law firm re-file the New York litigation against the Batbolds. This Section 1782 application appears to be the result of that demand: Because any attempt to re-file the New York State Supreme Court case would be frivolous, the Plaintiffs and their counsel filed this proceeding instead to further the Mongolian PR efforts. Now, political opponents of Mr. Batbold are falsely telling the public that this case is a *continuation* of the prior proceeding they discontinued in New York State Supreme Court. They do get one thing right: this *ex parte* application is just as flawed and disturbing as the New York action. Both proceedings represent abuses of judicial process designed merely to spread misinformation and inflict reputational harm.[7]

Accordingly, Mr. Batbold and Battushig seek leave to file a motion to intervene and to protect their confidential financial information from this abusive Section 1782 application. As the "party against whom the requested information is to be used" Mr. Batbold "has standing to challenge the validity of [the] subpoena on the ground that it is in excess of the terms of . . . § 1782." *Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997) (quoting *In re Letter Rogatory from Justice Court, Montreal*, 523 F.2d 562, 564 (6th Cir. 1975)); *see also In re Hornbeam*, 2015 WL 13647606, at *2 (S.D.N.Y. Sept. 17, 2017) (Broderick, J.) (granting the motion to intervene of a target of a Section 1782 application).

If permitted to intervene, Mr. Batbold and Battushig will raise objections to the application currently before this Court, including by supplying the Court with documentation evidencing that the named petitioners never authorized this application (or any of the other global actions), thus questioning authenticity of the application itself. Mr. Batbold will also object to the legitimacy of the discovery sought, demonstrating that the application is nothing more than a fishing expedition to invade bank records to see if any evidence exists to support the wild conjecture levied in the global litigations advanced against Mr. Batbold—none of which should be dignified with the imprimatur of this Court. *See Ayyash v. Crowe Horwath LLP*,

---

[7] Tellingly, Mr. Batbold was neither served with a copy of the purported petitioners' *ex parte* application nor provided with any notice of its filings, despite the fact that he is a target to the proceedings for which the discovery is sought. Instead, Mr. Batbold learned of this application when the filing and its inflammatory, false accusations were reported by the Mongolian media—leaked no doubt by the political actors ultimately responsible for the filing, and who did so for the purpose of making a defamatory media splash. That Mongolian media were able to learn of an *ex parte* application filed in this Court is unequivocal evidence that these litigations are designed to do nothing more than spread disinformation for the purpose of manipulating an upcoming election.

2018 WL 2976017, at *1, 3 (S.D.N.Y. June 13, 2018) (denying Section 1782 petition where the court was concerned that the discovery was "a fishing expedition" to determine if claims could be brought). Finally, Mr. Batbold and Battushig intend to object to the staggering overbreadth of the discovery requests here, which seek intrusive discovery into financial records of nearly forty individuals and entities over the course of more than a decade. That expansiveness alone justifies denial of the request. *See In re Tiberius Grp. AG*, 2020 WL 1140784, at *8 (S.D.N.Y. Mar. 6, 2020) (Broderick, J.) ("Turning to the substance of the requests, however, I agree that Applicant has not sufficiently justified the breadth and scope of their discovery requests in the face of Objectors' concerns about intrusiveness and relevance."). American discovery is liberal, but it is not so liberal so as to allow a foreign autocrat to wield discovery as a tool to harass or persecute rivals—let alone as an instrumentality to propagate disinformation.

For these reasons, Mr. Batbold respectfully requests the opportunity to be heard in connection with this Section 1782 application. Should the Court be amenable, we are prepared to immediately meet and confer with King & Spalding LLP, who claim to represent the petitioners, to arrive at a mutually convenient briefing schedule for the motion to intervene and, should intervention be granted, for a briefing schedule for Mr. Batbold and Battushig to oppose this Application. We thank the Court for its consideration.

Respectfully submitted,

/s Orin Snyder

cc:     All Counsel of Record (via ECF)